HALPERN MAY YBARRA GELBERG LLP
   Marc D. Halpern (CA Bar No. 216426)
   Gwendolyn M. Toczko (CA Bar No. 255984)
600 West Broadway, Suite 1060
San Diego, California 92101
Telephone: (619) 618-7000
marc.halpern@halpernmay.com
gwendolyn.toczko@halpernmay.com

HALPERN MAY YBARRA GELBERG LLP
   Susan P. Welch (CA Bar No. 145952)
550 S. Hope Street, Suite 2330
Los Angeles, California 90071
Telephone: (213) 402-1900
susan.welch@halpernmay.com
Attorneys for Plaintiff Emerald Holding, Inc.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMERALD HOLDING, INC., | CASE NO. 8:21-CV-00340 |
| Plaintiff, | |
| v. | **COMPLAINT FOR:** |
| | **1) DECLARATORY RELIEF** |
| W.R. BERKLEY SYNDICATE LIMITED and GREAT LAKES INSURANCE SE, | **2) BREACH OF CONTRACT** |
| | **3) BAD FAITH** |
| Defendants. | <u>**JURY TRIAL DEMANDED**</u> |

COMPLAINT

# INTRODUCTION

1.      This case is about Emerald Holding, Inc.'s ("Emerald") event cancellation policy insurers improperly and unreasonably delaying and reducing millions of dollars of payments owed for Emerald's events that have been cancelled, postponed or otherwise impacted in 2020 and 2021 by the COVID-19 pandemic.

2.      Emerald is a leading operator of business-to-business trade show events across the United States.  Each of Emerald's events is held at least annually, with certain franchises offering multiple editions per year.  To protect its core business, Emerald purchases broad event cancellation insurance coverage years in advance, including policies for 2020 and 2021 which are at issue here, and expressly including coverage for an outbreak of communicable disease like the current pandemic.

3.      Coverage under these policies for pandemic-caused cancellations and other impacts is not in question – and the defendant insurers already have paid over $100 million of what is owed for cancelled events.

4.      But another $100 million or more also is already owed.  At first, the defendant insurers promptly adjusted and paid claims for the first cancelled events in early 2020.  However, the insurers have since shifted tactics and have been going to greater and greater lengths to slow down payments ─ for example, by pretending they have not received information, needlessly prolonging investigations, raising new and unreasonable issues, pulling authority from experienced claims adjusters and switching to new adjusters more focused on delay, refusing basic requests, and other frustrating and improper tactics.  The insurers have now also improperly denied coverage for several events, saying they should not have been cancelled, even though cancellation was unavoidable with the ongoing pandemic.

5.      Meanwhile, Emerald has been working diligently and doing everything within its power to avoid cancellations and to mitigate its losses ─ for example, by postponing events where feasible, substantially reducing and recovering costs and expenses, exploring and implementing alternatives where possible, and other proactive measures in good faith.  The result has been tens of millions of dollars of loss reductions and avoidances.

6.      Moreover, Emerald also has put in enormous effort over the past 11 months to work cooperatively with the defendant insurers and their adjusters, to provide needed information, and to consider and/or adopt any useful proposals. Numerous people at Emerald have had nearly full-time jobs responding to insurer requests, liaising with the insurers and their adjusters, and working to obtain payments.  All while Emerald has a business to operate and protect under extremely challenging pandemic conditions.

7.      Nonetheless, as the pandemic continued and claims have accrued, instead of staying partners with Emerald, the insurers have become increasingly non-responsive, obstructive, and clearly focused only on their own interests to try to delay or reduce further payments.  They know Emerald's claims are legitimately covered, and they know many tens of millions of dollars in much needed coverage payments are already long overdue, including payments for some events as far back as March and April 2020.  The insurers just want to hold on to the money.

8.      The insurers' tactics and massive payment arrearages have begun to significantly prejudice Emerald.  As a result, Emerald has been forced to bring this action to enforce its coverage rights and obtain the money it is owed.

9.      This action seeks a declaratory judgment and awards of damages for breach of contract and bad faith against W.R. Berkley Syndicate Limited and Great Lakes Insurance SE, who are the insurers and subscribers to the Lloyd's of London event cancellation policies at issue (collectively, "Underwriters.")

# THE PARTIES

10.     Plaintiff Emerald Holding, Inc. is a corporation incorporated under the laws of the State of Delaware.  Its principal place of business when the policies were issued was in California, at 31910 Del Obispo Street, San Juan Capistrano, CA, 92675.[1]  Since mid-2020, Emerald's corporate headquarters has moved to New York city, while maintaining a significant office in San Juan Capistrano.

11.     On information and belief, Lloyd's of London is comprised of syndicates of underwriters and London market company underwriters that share liability as subscribers under insurance policies.  A typical Lloyd's of London policy will have multiple subscribers which collectively are responsible for 100 percent of the coverage provided by the policy.

12.     Defendant W. R. Berkley Syndicate Limited, on information and belief sometimes also referred to as Lloyd's Underwriter Syndicate No. 1967 WRB, is one of the two insurer subscribers to the event cancellation policies at issue in this action, and is thereby obligated to provide the insurance afforded by the policies.  In particular, W. R. Berkley Syndicate Limited is a subscriber for 39.5% of Policy No. PACES1800071 and 39.5% of Policy No. PACES1900032, as also set forth in those policies.  W. R. Berkley Syndicate Limited also is designated lead underwriter for Policy No. PACES1800071 and Policy No. PACES1900032.

13.     On information and belief, at all times relevant to this complaint, W. R. Berkley Syndicate Limited was authorized to transact and did, in fact, transact the business of insurance in the State of California.

---

[1] Plaintiff was previously known as Emerald Expositions Inc.  On February 3, 2020, the company filed a Certificate of Amendment to its Certificate of Incorporation with the Secretary of State of the State of Delaware to change its name to "Emerald Holding, Inc.," effective 12:01 a.m. Eastern Standard Time on February 14, 2020.

COMPLAINT

14.     On information and belief, all of the members of W. R. Berkley Syndicate Limited are United Kingdom residents or United Kingdom companies with principal places of business in the United Kingdom.

15.     Defendant Great Lakes Insurance SE, on information and belief a wholly-owned subsidary of Munich Re, is the other insurer subscriber to the event cancellation policies at issue and is thereby obligated to provide the insurance afforded by the policies.  In particular, Great Lakes Insurance SE is a subscribed for 60.5% of Policy No. PACES1800071 and 60.5% of Policy No. PACES1900032.

16.     On information and belief, at all times relevant to this complaint, Great Lakes Insurance SE was authorized to transact and did, in fact, transact the business of insurance in the State of California.

17.     On information and belief, Defendant Great Lakes Insurance SE is a foreign company organized under the laws of the United Kingdom, and maintains its principal place of business in London.

## JURISICTION AND VENUE

18.     This complaint has an independent basis of jurisdiction due to the complete diversity of the parties, and because the amount in controversy set forth in this complaint exceeds $75,000, exclusive of costs.  *See* 28 U.S.C. § 1332.

19.     Venue is proper in this District under 28 U.S.C. §1391 because jurisdiction is based only upon diversity of citizenship, and a substantial part of the events giving rise to this claim occurred in this District.

20.     Underwriters also have contractually agreed to submit to the jurisdiction of this Court.  In particular, each policy at issue provides that "It is agreed that in the event of the failure of underwriters hereon to pay any amount claimed to be due hereunder, the underwriters hereunder, at the request of the Named Insured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States."

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## GENERAL ALEGATIONS

**Emerald's Business**

21.     Emerald operates across multiple sectors and runs approximately 55 business-to-business trade shows, as well as other face-to-face events across the United States.

22.     Emerald's shows are frequently the largest and most well-attended in their respective industry verticals.  Emerald's trade show attendees use the shows to fulfill procurement needs, source new suppliers, reconnect with existing suppliers, identify trends, learn about new products and network with industry peers, and Emerald's portfolio of trade shows is well-balanced and diversified across both industry sectors and customers.

23.     Emerald generates the vast majority of its revenue through the live events that it operates.

24.     A portion of Emerald's revenue also is generated from other marketing services, including digital media and print publications that complement Emerald's events in the industry sectors it serves.  These other services also allow Emerald to remain in close contact with, and market to, its existing event audiences throughout the year.

**The Event Cancellation Insurance Policies**

25.     Due to the nature of its live trade show business, Emerald purchased the broad event cancellation policies issued by defendant Underwriters.

26.     Underwriters issued to Emerald two policies relevant to this action: Convention Cancellation Insurance Policy No. PACES1800071, with a policy period of at least April 24, 2018 to December 31, 2020 (the "2020 Policy") and Convention Cancellation Insurance Policy No. PACES1900032, with a policy

COMPLAINT

1    period of at least March 25, 2019 to December 31, 2021 (the "2021 Policy")

2    (collectively, the "Policies.")[2]

3        27.        Given the annual recurring nature of Emerald's events, and the long-

4    term planning involved for the events, each of the Policies was underwritten,

5    bound and issued almost two years in advance of the relevant year of events.

6    That is, the policy commencing on April 24, 2018 covers the events that were

7    scheduled for calendar year 2020.  The policy commencing March 25, 2019

8    covers the events that were scheduled for calendar year 2021.

9        28.        At all relevant times the required premiums have been fully paid for

10   the Policies and the Policies have been in full force and effect.

11       29.        The Policies identify the covered events and, where available, for each

12   event, the amount of covered revenue.  The Policies also contain provisions

13   allowing Emerald to add newly launched or acquired events throughout the

14   course of the Policies, and allowing Emerald to ask for additional coverage,

15   should there be an increase in the expected revenue for a covered event.

16       30.        As to the covered events for 2020 and 2021, the Policies cover losses

17   from, among other things, the cancellation, curtailment, postponement, removal

18   to alternative premises, abandonment, or enforced reduced attendance of an

19   event.

20       31.        The Policies refer to "Cancellation, Curtailment, Postponement,

21   Removal to Alternative Premises, or Abandonment" as "the inability of the

22   Named Insured to open or commence, keep open, or otherwise maintain the

23   Event in whole or in part for its original published duration or scope."

24

25

---

26   [2] The Policies and their terms are incorporated into the allegations of this
     Complaint by reference, but have not been attached due to their volume and
27   because they also contain certain proprietary event-specific information.
     Underwriters have full copies of the Policies, and copies can be provided to the
28   Court upon request.

32.    The Policies refer to "Enforced Reduced Attendance" as "the enforced inability of Participants to attend the Event solely and directly as a result of the same specific cause, which is beyond their control and is not otherwise excluded."

33.    The Policies expressly provide within their coverage pandemic-caused cancellations and other losses, for example, providing that "in consideration of the premium paid, it is hereby noted and agreed with effect from inception, this insurance is extended to cover your irrecoverable expenses and loss of net profit, as insured under this policy, arising from an outbreak of communicable disease."

34.    Most of the coverages under the Policies are subject to total aggregate limits. Those limits are $191,124,000 for the 2020 Policy and $191,472,824 for the 2021 Policy.

35.    The Policies also provide certain relevant coverages in addition to the policy limits, such as coverage for remedial actions to minimize the extent of any loss and coverage for certain additional promotional and marketing expenses.

**Emerald's Cancellations and Other Losses**

36.    Beginning in early 2020, the widespread outbreak of COVID-19 forced the cancellation of numerous trade show events.

37.    As the dramatic impacts of the pandemic have continued into 2021, Emerald has continued to be compelled to cancel most of its events.

38.    To every extent feasible, and at great effort, Emerald has attempted to mitigate its losses and avoid cancellations.

39.    For example, when possible, Emerald has postponed many events. However, given the duration of the ongoing pandemic and given the annual and seasonal nature of the events, postponements did not provide for any meaningful mitigation for the 2020 events, which nearly all had to be cancelled from March 2020 forward. Postponements of some early season 2021 events may significantly reduce the number of cancelled events in 2021, depending on what

COMPLAINT

the future holds, but cancellation already has been unavoidable for a number of 2021 events.

40.     Likewise, Emerald has gone to great effort to obtain forgiveness, reduction or forbearance of cost commitments for impacted events.  And, when possible, Emerald has attempted to make event cancellation or postponement decisions sufficiently in advance to maximize cost avoidance.  The result has been to greatly reduce Emerald's expense-related losses, by tens of millions of dollars.

41.     Emerald also has carefully explored hosting modified versions of events, splitting events, consolidating events, moving events, and nearly every other practical possibility to minimize its losses.

42.     As a result of all these efforts, Emerald's relevant losses in 2020 are substantially below the 2020 Policy limits, which easily could not have been the case.   Similarly, while tens of millions in losses for cancelled and postponed events have already accrued for early-year 2021 events, those losses could easily be much higher, but for Emerald's persistent efforts to postpone numerous events and do whatever it reasonably can to reduce its losses and minimize its claims.

**Emerald's Coverage Claims, Underwriters' Acknowledgement of Coverage and the Commencement of Payments**

43.     Emerald timely provided notice under the Policies of the impact of the pandemic and began submitting claims as events were impacted.  These submissions began with events in early 2020 and then continued with events throughout the remainder of 2020, and more recently have included various events in 2021.  Taken together, all coverage claims under the Policies concerning 2020 and 2021 events will be referred to as the "Coverage Claims."

44.     Underwriters responded, starting in early 2020, by acknowledging the claims, appointing loss adjusters who are very experienced with claims under these types of Lloyd's of London event cancellation policies at a company called

8

COMPLAINT

Premier Insurance Services ("Premier"), and working with Emerald and its broker Marsh McLennan ("Marsh") to obtain event-specific information that will allow for processing and payment of each Coverage Claim submission.

45.     The process was smooth at first, as it should be, and the initial submissions were promptly accepted, adjusted and paid nearly in full.

46.     For example, the first full event cancellation claim submission was for the March 22, 2020 ASD event.  Claim specifics were submitted on April 10, 2020, through Marsh, with a loss total of over $20 million for the event after mitigation efforts.  Just over a month later, Underwriters issued an initial interim payment of approximate 67% of that event claim.  Several weeks later, Underwriters paid over 25% more of the claim.  Meanwhile, during that time, through back-and-forth between Emerald, Marsh, Premier and the Underwriters, the submission amount was adjusted to account for some additional cost payments and mitigations for a net decrease to the claim of a few hundred thousand dollars in additional savings.  The result was that within about 90 days of the original March ASD event cancellation submission, Emerald received loss payments for almost 95% of the submission.

47.     Then, a couple months later, in early September 2020, and about 5 months after the submission, Underwriters and Emerald agreed to a final additional coverage payment for the ASD event cancellation that would result in about 99% payment of the submitted loss for that event.

48.     No big complaints there.[3]  That is how the Policies are *supposed* to work and how the claims are *supposed* to be adjusted and paid.  Clearly, the Underwriters understand that, and understand what their obligations for these claims are supposed to be in terms of timing and amount of payment.

---

[3] Although the final payment for the ASD event was promised in September 2020, the Underwriters still have not paid this additional amount.

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Losses Mount And Underwriters Start Misbehaving In Order To Delay Payment**

49.     However, Underwriters' behavior towards the Coverage Claims quickly deteriorated.  As the pandemic raged on and more events had to be cancelled, Underwriters started engaging in delay tactics to hold on to their money.

50.     The cancellation claim submissions started taking longer and longer for Underwriters to process, and Underwriters started taking longer and longer to pay anything, and when they did issue payment, it was for smaller and smaller percentages of the covered claims.

51.     For example, Emerald provided its second batch of claim submissions to the Underwriters on April 30, 2020.  This second batch of submissions consisted of seven cancelled events that were scheduled between March and June 2020.  The total submission amount was over $40 million.  The Premier adjusters reviewed these submissions and provided payment recommendations to Underwriters on a similar timeline to the ASD event.  But this time, the initial payment from Underwriters took 75 days, instead of 45 days, and then further payments were stalled by even longer.

52.     Subsequent submissions batches received even slower attention towards payment, regardless of whether Underwriters had received adjustment reports from Premier.  On the 3rd and 4th batches of event cancellation submissions, which were provided in May 2020, Underwriters took about 120 days to issue initial payments, and this time those payments were for lower percentages than earlier submissions.  After that, there were a number of submissions that did not receive any initial payment for many, many months.  There are still, to this day, numerous 2020 cancelled covered events where no initial payment has been received.

53.     Notwithstanding Underwriters' delays in making payments, Emerald

COMPLAINT

1   continued to do its job on mitigating losses, submitting claims, and following up

2   with prompt responses to Underwriter and adjuster requests.  Throughout the

3   summer and fall of 2020, Emerald continued to provide an event-by-event

4   breakdown of cancellations and postponements, outlining its careful

5   consideration of alternatives and possible mitigation measures in light of market

6   research, participant surveys, ongoing and projected government restrictions, and

7   local and national pandemic status information.

8   **Underwriters Start Reassigning And Derailing The Adjustment Process**

9        54.     By October 2020, Underwriters had not only slowed down payment to

10   a crawl, but they then slowed down claim adjustment to a crawl by engaging

11   attorneys at the Troutman Pepper firm to essentially take over the claims-

12   handling function from Premier.

13        55.     Though outwardly maintaining to be outside coverage counsel, on

14   information and belief, Troutman Pepper began assuming the adjusting role, by

15   taking over authority from Premier, reviewing the claims, instructing Premier on

16   what to ask and say to Emerald and Marsh, and instructing Premier on what it

17   should say (or not say) in its reports to Underwriters, providing coverage

18   responses, and ultimately making the claim-adjustment and payment

19   recommendations and decisions for Emerald's Coverage Claims.

20        56.     On information and belief, based on the subsequent claims

21   communications and handling, one of the primary functions of these new

22   adjusters was to further slow things down, question everything, and further

23   reduce and delay payment on covered claims.

24        57.     Indeed, despite Underwriter's express statements that they were

25   relying on Premier to assess the value of each claim, on information and belief,

26   around this time, Underwriters began routinely reducing or ignoring the amount

27   that Premier recommended should be paid to Emerald.

28        58.     Around this same time Underwriters, through these new adjusters,

began asserting various other new improper bases for delaying, withholding or denying coverage.

59.     For example, for many of the cancelled 2020 events, Underwriters suddenly refused to use the expected revenue amounts underwritten into the 2020 Policy and on which the 20220 Policy premium had been based.  For some events, Underwriters simply reduced the covered revenue amount without any notification or explanation to Emerald.  For about 10 other events, Underwriters refused to make any payment until Emerald provided additional substantiation to prove the revenue estimate that was already agreed by Underwriters and part of the policy.

60.     As another example, these new adjusters said they were unilaterally imposing new claims "protocols" and reporting requirements not agreed to by Emerald and not required by the Policies, and in some instances at odds with the terms of the Policies.  Subsequently, the new adjusters would use those self-serving "protocols" to contend that Emerald had not yet done what they asked. The veiled purpose of these additional protocols was obviously to provide a basis on which Underwriters could try to further delay or avoid payments on the covered claims.

61.     Underwriters, through these new adjusters, would also start pretending they did not receive sufficient information in advance of a cancellation or postponement, and that they might have been prejudiced from exercising a right to salvage the event.  These arguments were being raised by Underwriters despite repeatedly having been given ample opportunity to propose viable alternatives to cancellation, but never having done so for any event.  Indeed, to the contrary, the Underwriters have repeatedly expressly deferred to Emerald's expertise in knowing when a cancellation is unavoidable or when mitigation measures make sense based on the event-specific requirements and considerations.

COMPLAINT

12

**Underwriters Start Denying Some Claims By Baselessly Contending That Cancellation Was Avoidable, While There Was No Viable Alternative**

62.     Recently, Underwriters, through the new adjusters, have gone so far as to deny coverage for three events in late 2020 by groundlessly contending that the events should not have been cancelled, and based on an improper interpretation of the Policies that, unless there is an order legally prohibiting an event from going forward, cancellation was avoidable, and so there is no coverage.

63.     As further evidence that Underwriters are simply now taking whatever position escapes paying coverage, they subsequently refused to agree to the cancellation of an event in Long Beach, California, a location where gatherings were, in fact, legally prohibited.

64.     Likewise, while Underwriters contend that the denied events could have gone forward in some reduced or alternative form, they have not indicated what that form was, and have not provided any adjustment or payment as to the losses that would still have resulted if such a hypothetical event had taken place. Indeed, that is because the losses would have been even greater if such a hypothetical event had been attempted.  But rather than doing any such analysis, or actually having proposed any concrete alternative for a specific event, the new adjusters simply indicated that Underwriters were denying the claim.

**Underwriters Start Improperly Withholding Payments For Outstanding 2020 Coverage Claims Based On Alleged Reserve For "Indirect Cost" Savings**

65.     Underwriters, through their new adjusters, also have recently started contending, without any reasonable or justifiable basis, that there were about $30 million of corporate-level SG&A savings in 2020 that need to be credited as an offset to covered event cancellations.

66.     However, an interpretation of the Policies that the Underwriters get credited corporate overhead savings is directly contrary to the language of the

Policies, which expressly limits relevant expenses to "expenses … to hold events." That is, for each event the relevant expenses must be tied to holding that event. There is no reference to so-called "indirect costs" or "overhead" anywhere in the Policies.

67. Because it is not relevant to coverage, corporate overhead was not included in the event-by-event financial calculations used by Underwriters, the brokers, and Emerald in the underwriting of the Policies, or in the associated event schedules attached to the Policies.

68. Nor have such expenses been included in the claim submissions for the various events. Rather, Emerald has stuck to the applicable principle that the relevant expenses are those incurred "to hold events."

69. Second, Emerald has provided extensive and detailed information to Underwriters showing the corporate-level savings for 2020, explaining each category of savings and how it does not relate to holding events. Yet, despite clearly having no basis for a continued withholding of tens of millions of dollars on this alleged issue, Underwriters have refused to change their position or reduce the withholding.

70. Instead, Underwriters have continued to delay by contending they do not have enough information and by giving Emerald more make-work tasks such as demanding voluminous additional irrelevant documents.

**<u>Underwriters Are Improperly Trying To Coerce Emerald To Change The 2021 Policy Terms</u>**

71. Stuck having issued Emerald the 2021 Policy back in 2019 that will now provide another year of coverage for Emerald's pandemic event cancellations, Underwriters improperly have been trying to force Emerald into agreeing to modify the 2021 Policy terms to reduce the promised coverage.

72. Specifically, Underwriters, through the new adjusters, have been insisting that there will be no payment on any claim under the 2021 Policy until

COMPLAINT

Emerald agrees to an endorsement with "updated" revenue amounts for the 2021 events.

73.    For example, in various letters from the new adjusters, they have asserted that "the events that will be covered under the 2021 Policy, and the amount of coverage provided for these events, cannot be determined with finality until: (i) Emerald provides [Underwriters] with a schedule of events for 2021 that Emerald actually expects to stage and provides budgets for those events that reflect the realities of the impacts of COVID-19; and (ii) the schedule and budgets are accepted by [Underwriters] via an endorsement attached to the 2021 Policy."

74.    However, the pandemic already is impacting what might be able to take place in 2021, which is the whole point of the Policies and of having coverage based on the pre-pandemic expected revenues.  So Underwriters are effectively trying to gut the 2021 Policy of that coverage, by modifying the pre-pandemic revenues to become mid-pandemic revenue numbers.

75.    Rather, the 2021 Policy is in full force and effect as is, providing coverage for the anticipated revenues at the time of underwriting, as is reflected in the 2021 Policy that was legally bound in March 2019, timestamped by the two Underwriters at 4:30 p.m. on March 25, 2019 and 5:02 p.m. on March 26, 2019 respectively.

76.    Even worse, Underwriters are trying to leverage Emerald's financial need for coverage payments to coerce Emerald into agreeing to these prejudicial changes as a pre-requisite to paying *any* coverage under the 2021 Policy.  Such tactics are at best bad faith, and may go beyond that.

**Emerald Has Been Compelled To File This Action**

77.    The above allegations are some main examples of Underwriters' improper positions and unreasonable conduct over the past several months with respect to the Coverage Claims.

COMPLAINT

78.     In sum, by early 2021 it became clear to Emerald that Underwriters no longer had any intention of properly adjusting and paying the Coverage Claims, nor any intention of working with Emerald in good faith.  Rather, Underwriters' primary objective had become to ignore, delay or contest their coverage obligations.

79.     No matter what Emerald proposed or did with respect to event decisions or requests, Underwriters would say it was wrong or insufficient.  No matter what Emerald did to further support and prove up its claims, Underwriters would say it was not good enough and more information was needed.

80.     Likewise, when Emerald has requested any of the additional coverages provided by the Policies, such as marketing expenses, Underwriters have been dilatory and ultimately non-responsive.

81.     In all, Underwriters are currently improperly withholding over $100 million in coverage payments due to Emerald under the Policies.

## FIRST CAUSE OF ACTION

### (Declaratory Relief)

82.     Emerald incorporates the allegations of Paragraphs 1 through 81 of this Complaint, as though fully set forth herein.

83.     There presently exists an actual justiciable controversy between Emerald, on the one hand, and Underwriters, on the other hand, concerning Underwriters' coverage obligations with respect to the Coverage Claims.

84.     The controversy between Emerald and Underwriters is ripe for judicial review.

85.     Accordingly, Emerald seeks a declaration confirming that under the Policies:

(a)     Emerald is entitled to payment of the amounts of submitted losses for each of the events within the Coverage Claims.

(b)     Underwriters cannot use corporate overhead savings to reduce the

amounts of coverage owed for the Coverage Claims.

(c)     Underwriters must adjust the Coverage Claims based on the pre-pandemic anticipated revenues.

(d)     Underwriters cannot require an endorsement to the 2021 Policy as a pre-requisite to paying the Coverage Claims.

(e)     Underwriters' denials of coverage for events where it has paid no coverage are improper.

(f)     Underwriters are obligated to provide coverage to Emerald for Future Marketing Expenses with respect to the covered events.

(g)     Underwriters are obligated to provide timely and regular payments to Emerald for Coverage Claims according to a reasonable protocol determined by the Court.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

86.     Emerald incorporates the allegations of Paragraphs 1 through 85 of this Complaint, as though fully set forth herein.

87.     The Policies are valid and enforceable contracts between Emerald and Underwriters.

88.     The Coverage Claims present covered losses under the terms of the Policies.

89.     Emerald has performed each and every material obligation imposed upon it by the Policies in order to obtain full coverage for the Coverage Claims, except to the extent such performance was either prevented or excused by Underwriters.

90.     All other applicable conditions or prerequisites under the Policies obligating Underwriters to acknowledge and pay full coverage for the Coverage Claims have been satisfied.

91.     Nonetheless, to date, Underwriters have failed to timely provide the

COMPLAINT

coverage owed to Emerald for the Coverage Claims, and have only made payments of portions of some of the Coverage Claims.  Some of the Coverage Claims have been denied altogether.

92.    Also, even for the coverage payments that have been made, most of the payments have not been timely and have been excessively delayed in violation of Underwriters' obligations under the Policies and/or applicable law.

93.    Underwriters also have failed or refused to provide the additional coverages provided by the Policies, such as Future Marketing Expenses, when they have been requested.

94.    Underwriters also have breached the implied covenant of good faith and fair dealing as set forth in the allegations herein and in the Third Cause of Action below.

95.    As a direct and proximate result of these breaches, Emerald has suffered and continues to suffer damages, comprised of the remaining coverage owed by Underwriters under the Policies for the Coverage Claims, as well as consequential damages from these breaches.

## THIRD CAUSE OF ACTION

### (Bad Faith)

96.    Emerald incorporates the allegations of Paragraphs 1 through 95 of this Complaint, as though fully set forth herein.

97.    The Policies contain an implied covenant by Underwriters, and associated duty, that they will act in good faith and deal fairly with Emerald and that they would do nothing to interfere with the rights of Emerald to receive the benefits of the Policies.

98.    Underwriters' improper efforts to delay, reduce or avoid their obligations with respect to the Coverage Claims is unreasonable and constitutes bad faith.

99.    This conduct includes, among other things, the numerous improper

COMPLAINT

actions and inactions described throughout this Complaint – such as delaying or refusing payments without explanation or good cause, taking unreasonable positions to avoid or delay coverage obligations, failing to properly and reasonably investigate and adjust coverage, ignoring the determinations of claims adjusters that recommend payment and instead substituting new adjusters focused on delaying or contesting coverage, creating and relying on false obstacles to coverage, and improperly denying claims without reasonable basis.

100.    In so doing, Underwriters have also improperly put their own financial interests above the interests of their policyholder Emerald, and above their obligations to their policyholder Emerald.

101.    Underwriters have also done all of this with the clear intention of avoiding or delaying their obligations and of pressuring Emerald to accept less coverage than it is otherwise owed under the Policies.  As a result, Underwriters' bad faith conduct was also willful and malicious.

102.    By these actions and inactions, Underwriters' have breached the covenants of good faith and fair dealing with respect to the Policies, and have conducted themselves tortiously in bad faith.

103.    As a direct and proximate result of the above-referenced bad faith, Plaintiff has suffered and will continue to suffer damages. These damages include Emerald's attorney's fees in prosecuting this action, as well as other special economic and consequential damages.  Consequential damages also were reasonably contemplated by the parties at the time they entered into the Policies with respect to such bad faith conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Emerald prays for judgment as follows:

(a)    On the First Cause of Action, for a judicial declaration adopting each of Emerald's contentions set forth in the above Cause of Action for Declaratory

1   Relief, and providing such further guidance as to the parties' respective rights

2   and obligations under the Policies as useful to fully resolve the parties' disputes

3   regarding the Coverage Claims and the Policies;

4       (b)    On the Second Cause of Action, for an order and declaration that

5   Underwriters have breached their obligations to Emerald under the Policies with

6   respect to each of the Coverage Claims, and awarding compensatory damages in

7   the amount of all unpaid portions of the Coverage Claims, and further

8   compensatory and consequential damages amounts to be proven at trial;

9       (c)    On the Third Cause of Action, for an order and declaration that

10  Underwriters breached their duty of good faith and fair dealing under the

11  Policies, and awarding compensatory damages in an amount to be proven at trial,

12  including attorney's fees, expenses and costs prosecuting the other causes of

13  action in this lawsuit, and awarding such consequential, exemplary and punitive

14  damages as may be available and appropriate in amounts to be proven at trial.

15      (d)    On all Causes of Action, for an award of Emerald's costs of suit

16  incurred herein, for an award of all legally available interest, and for such other

17  and further relief as the Court may deem just and proper.

18

19  Dated:  February 22, 2021         HALPERN MAY YBARRA GELBERG LLP
                                       Marc D. Halpern
20                                     Susan P. Welch
                                       Gwendolyn M. Toczko
21

22                                     By:  s/ Marc D. Halpern
23                                          Marc D. Halpern
                                       Attorneys for Plaintiff Emerald Holding, Inc.
24

25

26

27

28

COMPLAINT

1

## <u>JURY TRIAL DEMAND</u>

2

Plaintiff Emerald Holding, Inc. demands a trial by jury.

3

4      Dated:  February 22, 2021          HALPERN MAY YBARRA GELBERG LLP

5                                         Marc D. Halpern
                                          Susan Welch
6                                         Gwendolyn M Toczko

7
                                          By: _s/ Marc D. Halpern_____
8                                              Marc D. Halpern
                                          Attorneys for Plaintiff Emerald Holding, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT